# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 27
The People &c.,
     Respondent,
      v.
Kenneth Slade,
     Appellant.
------------------------------
No. 28
The People &c.,
     Appellant,
      v.
Kieth Brooks, &c.,
     Respondent.
------------------------------
No. 29
The People &c.,
     Appellant,
      v.
Charo N. Allen,
     Respondent.


Case No. 27:
John L. Palmer, for appellant.
Paul A. Andersen, for respondent.

Case No. 28:
Paul A. Andersen, for appellant.
Elizabeth Isaacs, for respondent.

Case No. 29:
Lauren Tan, for appellant.
Felice Milani, for respondent.

GARCIA, J.:

In these three appeals, defendants challenge the facial sufficiency of the accusatory instrument filed against them, arguing that participation of a translator in the process of documenting the information from first-party witnesses with limited-English proficiency

created a hearsay defect requiring dismissal of the instrument. In the first two cases, applying our well-settled precedent, we hold that no facial defect was evident within the four corners of the accusatory instrument. Moreover, even in the third case where the participation of a translator was documented within the witness's supporting affidavit, we conclude that no additional layer of hearsay was created by the use of a translator and therefore that accusatory instrument too was facially sufficient. Defendants have a right to be prosecuted by an information that meets all statutory requirements, as was the case here, but we decline to impose additional barriers to participation in the process for victims with limited-English proficiency.

I.

a. Kenneth Slade

Slade assaulted his wife (the victim) at the home they shared and was charged in a misdemeanor complaint with assault in the third degree, a class A misdemeanor, and harassment in the second degree, a violation. The victim, as the deponent, asserted the following in the complaint:

> "at the above time and place, while she was seated in a chair [Slade] grabbed her by both her arms and lifted her off of the chair then threw her back onto the chair. . . . [A]s a result of [Slade's] aforementioned actions she experienced bruising, swelling, and substantial pain to both arms and lower back and experienced annoyance, alarm, and fear for her physical safety."

The victim verified the complaint by signing it beneath the form notice stating that false statements made therein were punishable as a class A misdemeanor (*see* CPL 100.30 [1]

[d]).  In a certificate of translation, prepared on the same day as the complaint, a translator stated that she translated the English-language complaint to the victim, including the form notice, in Spanish and that the victim confirmed to the translator that she understood what was translated.

At Slade's arraignment, the People announced that they were ready for trial, relying on the first-party complaint.  However, the People did not file or serve the certificate of translation at that time, only doing so more than two years later upon Slade's request for the document.  Slade thereafter moved to dismiss the accusatory instrument on statutory speedy trial grounds, arguing that the People's statements of readiness were illusory because the filing of the certificate was necessary to convert the complaint into an information (*see People v Colon*, 110 Misc 2d 917, 920 [Crim Ct, NY County 1981], *reinstated for the reasons stated in Crim Ct opn* 59 NY2d 921 [1983] ["the People cannot be ready for trial . . . if they have not converted the complaint() to (a) jurisdictionally sufficient information()"]).  Criminal Court denied the motion and, following a bench trial, found Slade guilty of attempted assault in the third degree and harassment in the second degree and imposed sentence.

The Appellate Term affirmed, concluding, as relevant here, that "the first-party complaint signed by" the victim "needed no certificate of translation for conversion to an information, since there was no indication on the face of the instrument that [she] had not read and understood it or was incapable of doing so" (63 Misc 3d 161[A], 2019 NY Slip

Op 50893[U], *1 [App Term, 1st Dept 2019]). A Judge of this Court granted Slade leave to appeal (*see* 34 NY3d 984 [2019]).

## b. Kieth Brooks (a/k/a Keith Brooks)

The People filed an English-language misdemeanor complaint charging Brooks with driving while intoxicated, a misdemeanor, and other Vehicle and Traffic Law offenses. The deponent, a police officer, stated that a witness related the following: that he saw Brooks operating a van, that the van rear-ended the witness's vehicle, and that Brooks fled without providing any identifying information. The deponent police officer claimed, based on his own observation, that Brooks exhibited signs of intoxication and that he was present when Brooks refused a breathalyzer test.

The People were not ready at arraignment because they lacked supporting depositions from the witness and another police officer. Later, the People simultaneously filed an off-calendar statement of readiness, the two outstanding supporting depositions, and a certificate of translation. The witness's supporting deposition stated that he had "read the complaint" and that the facts attributed to him in that document pertaining to Brooks's operation of the van and actions after the crash were "true upon [his] personal knowledge." The witness signed the deposition under a form notice stating that false statements made therein were punishable as a class A misdemeanor, as required for verification (*see* CPL 100.30 [1] [d]). In the certificate, a translator said that she translated the English-language "accusatory instrument" to the witness, including the form notice, in Spanish and that the witness confirmed to the translator that he understood what was translated.

At a subsequent calendar call, Criminal Court determined that the certificate of translation was defective because it failed to state the translator's qualifications. As a result, the court concluded that the complaint was not converted to an information and that the People would be charged speedy trial time until they filed a proper affidavit of translation. After the People refused to take any additional steps to convert the complaint on the ground that no further action was required by the CPL to effectuate conversion, the court granted Brooks's motion to dismiss the accusatory instrument on statutory speedy trial grounds.

The Appellate Term affirmed, concluding that Criminal Court "providently exercised its discretion in requiring a proper certificate of translation to be produced in order to convert the complaint into an information" because the People "provided sufficient indicia" of the witness's inability to understand English when they filed the translator's statement with the supporting deposition (63 Misc 3d 158[A], 2019 NY Slip Op 50859[U], *1 [App Term, 1st Dept 2019]). The court further determined that the certificate of translation filed by the People failed to convert the complaint within the speedy trial period because the certificate "did not comply with CPLR 2101 (b)" (*id.*, citing Uniform Rules for Trial Cts [22 NYCRR] § 200.3). A Judge of this Court granted the People leave to appeal (*see* 34 NY3d 979 [2019]).

### c. Charo N. Allen

Allen was charged with menacing in the second degree, a class A misdemeanor, after she allegedly threatened a restaurant worker (the complainant) with a knife. A police

officer drafted the English-language misdemeanor information, which stated that the charge was based on the complainant's sworn statement to the effect that Allen, a customer at the restaurant where the complainant was working, became angry because the complainant informed her that she could not leave the establishment with an alcoholic beverage. The situation escalated, and Allen allegedly threatened the complainant with a steak knife. The deposition includes a representation that the complainant "had this statement consisting of [one] page read to [her] in Spanish" by a police officer and that she swore that it was the truth. The complainant verified the deposition by signing it under a form notice stating that false statements made therein were punishable as a class A misdemeanor (*see* CPL 100.30 [1] [d]).

Allen moved to dismiss the accusatory instrument as facially insufficient, contending that the translation created a layer of hearsay that the People failed to appropriately remedy. In opposition, the People filed an affidavit of translation executed by the officer who translated the deposition. He swore that he understood English and Spanish and that the complainant's statement was a true and accurate translation by him of the complainant's spoken Spanish statement. The officer averred that he translated the written English statement into Spanish for the complainant and she signed the deposition after confirming its accuracy.

The District Court adjourned Allen's motion and directed the People to file a superseding information that included: (1) a verified affidavit from the complainant "in the language of said individual," including a verification in that language; (2) an English

translation of that document; and (3) an affidavit by the translator stating his qualifications and attesting to the accuracy of the translation, as purportedly required by CPLR 2101 (b). The People ultimately declined to do so, and the court dismissed the matter on facial sufficiency grounds.

The Appellate Term affirmed (*see* 63 Misc 3d 159[A], 2019 NY Slip Op 50869[U], *3 [App Term, 2d Dept, 9th & 10th Jud Dists 2019]).  The court explained that there was no evidence that the complainant "had reviewed her written English statement for its truth and accuracy" and, therefore, "a certificate of translation was required to cure the hearsay defect, since the written English statement was being used to support the accusatory instrument" (*id.* at *2 [internal quotation marks and citation omitted]).  A Judge of this Court granted the People leave to appeal (*see* 34 NY3d 978 [2019]).

## II.

A misdemeanor complaint "serves merely as the basis for commencement of a criminal action, permitting court arraignment and temporary control over the defendant's person where there is as yet no prima facie case" (*People v Weinberg*, 34 NY2d 429, 431 [1974]).  To proceed with a prosecution, however, a misdemeanor complaint must be replaced by an information.  Simply stated, the requirements for the factual portion of a local criminal court information are:

> "that it state facts of an evidentiary character supporting or
> tending to support the charges; that the allegations of the
> factual part . . . together with those of any supporting
> depositions . . . provide reasonable cause to believe that the
> defendant committed the offense charged; and that the non-

hearsay allegations of the information and supporting depositions establish, if true, every element of the offense charged and the defendant's commission thereof"

(*People v Casey*, 95 NY2d 354, 360 [2000] [internal quotation marks, citations, and brackets omitted]).  At issue in these appeals is the last of the listed requirements, namely that non-hearsay allegations, if true, support a prima facie case.  This requirement is meant to "protect a defendant against groundless criminal proceedings by providing reasonable guarantees against baseless prosecutions not predicated on probable cause" (*id.* at 363 [internal quotation marks and citation omitted]).  That protection was amply afforded by the first-person allegations made in each of the accusatory instruments at issue here.

a.  Slade and Brooks

We can resolve the challenges to the accusatory instruments in *Slade* and *Brooks* by applying our well-settled rules regarding facial sufficiency.  As we recently reiterated, "in evaluating the sufficiency of an accusatory instrument," a court does "not look beyond its four corners (including supporting declarations appended thereto)" (*People v Hardy*, 35 NY3d 466, 475 [2020]; *see* CPL 100.15 [3]; 100.40 [1] [c]; *People v Thomas*, 4 NY3d 143, 146 [2005]).  Courts must "not rely on external factors to create jurisdictional defects not evident from the face of the" accusatory instrument (*People v Konieczny*, 2 NY3d 569, 576 [2004]).  Instead, "[w]hether the allegation of an element of an offense is hearsay, rendering the information defective, is to be determined on a facial reading of the accusatory instrument" (*Casey*, 95 NY2d at 361).

Defects that do not appear on the "the face of the" accusatory instrument are "latent deficienc[ies]" that do not require dismissal (*Matter of Edward B.*, 80 NY2d 458, 463 [1992]; *see Matter of Nelson R.*, 90 NY2d 359, 363 [1997]).  In *Matter of Edward B.*, we considered whether an accusatory instrument that was "supported in relevant part only by hearsay [was] jurisdictionally defective and must be dismissed . . . when the hearsay character of the facts alleged in the supporting deposition [was] not facially apparent but [was] discovered at some point in the course of the proceeding" (80 NY2d at 460-461). The hearsay defect, an assistant corporation counsel's unconfirmed summary of the complainant's statement, was first discovered by the respondent during the fact-finding hearing on the juvenile delinquency petition.  We concluded that, although there was indeed a hearsay defect in light of the assistant's actions "in editing and revising the complainant's version of events before transcribing it," the defect was properly classified as a latent deficiency because "the claimed flaw" was "not apparent from the face of the instrument itself" (*id.* at 462-463).  Explaining that the relevant Family Court Act provisions were analogous to the provisions of the CPL governing facial sufficiency, which permit dismissal only if the error is apparent from the face of the accusatory instrument (*see* CPL 100.40), we held that "latent deficiencies in the accusatory instrument that are revealed during the trial or hearing do not provide a ground for mandatory dismissal" (*see Matter of Edward B.*, 80 NY2d at 465).  *Matter of Edward B.* therefore specifically rejected the notion that a latent deficiency renders a facially sufficient accusatory instrument a nullity.  We later made clear that the holding in *Matter of Edward B.* was not limited to latent deficiencies discovered during a trial or fact-finding hearing (*see Matter of Nelson*

*R.*, 90 NY2d at 361-363 [latent deficiency identified prior to the fact-finding hearing did not render the petition facially insufficient and, therefore, did not mandate pre-hearing dismissal]), nor was it limited to Family Court proceedings (*see Casey*, 95 NY2d at 361 [applying *Matter of Edward B.* to criminal proceedings]).[1]  In sum, "[n]either the statutes establishing the criteria for accusatory instruments . . . nor the policies underlying those statutes suggest that an inquiry beyond the facial validity" of the accusatory instrument "is necessary or even appropriate" (*Matter of Edward B.*, 80 NY2d at 465).

Slade argues that the English-language misdemeanor complaint filed against him contained hearsay because the complaint did not set forth the victim's personal knowledge and observations, but rather was merely the translator's interpretation of her statement. Even assuming that an accurate translation creates a layer of hearsay for pleading purposes, a contention we reject in the next section, the accusatory instrument here is facially sufficient because, as in *Matter of Edward B.*, there is no hearsay defect apparent on the face of the document.  As the Appellate Term concluded, "there was no indication on the face of the" first-party complaint that the victim "had not read and understood it or was incapable of doing so" (2019 NY Slip Op 50893[U], *1; *see Matter of Shaquana S.*, 9 AD3d 466, 466 [2d Dept 2004]).  Although a certificate of translation was created at the same time as the complaint, it was not referenced or incorporated in that document and therefore the certificate cannot be used to create a "facial defect" otherwise undetectable

---

[1] Our dissenting colleague is incorrect in his assertion that we rely on "a couple of cases decided under the Family Court Act" in articulating this rule (Wilson, J., dissenting op at 5).

on the face of the accusatory instrument.  No inquiry beyond the instrument's face is required or appropriate.

Brooks alleged a latent deficiency—and made his speedy trial motion—earlier in the pretrial proceedings than Slade.  Irrespective of the timing of its discovery, however, a latent deficiency in a facially sufficient accusatory instrument does not mandate dismissal (*see Matter of Nelson R.*, 90 NY2d at 361-363).  As in *Slade*, the face of the complaint and the witness's supporting deposition in *Brooks* give no indication that the documents were translated for the witness or that he failed to read, have read to him, or understand the English-language documents.  And, as with *Slade*, the four corners of the complaint, including the witness's accompanying supporting deposition, contain no indication of any translation or other potential hearsay defect.

Although the certificate of translation was filed at the same time as the witness's supporting deposition, it is not part of that document.  Nor is it part of the complaint.[2] Brooks's attempt to use an external factor, the certificate, to establish a hearsay defect not evident on the face of the complaint and supporting depositions fails to raise any facial deficiency and must therefore be rejected.

Moreover, the CPL does not require a certificate of translation, let alone a certificate in any particular form, to create a facially sufficient instrument (*see* CPL 100.15; 100.40

---

[2] The certificate of translation is not a supporting deposition.  It was not verified by the translator and, in any event, it does not contain factual allegations of an evidentiary character that support the complaint's charges (*see* CPL 100.20).

[1]).  The Uniform Rules for Trial Courts generally direct courts exercising criminal jurisdiction to "comply[] with the applicable provisions of CPLR 2101" (22 NYCRR 200.3; *see* CPLR 2101 [b] ["Where an affidavit or exhibit annexed to a paper served or filed is in a foreign language, it shall be accompanied by an English translation and an affidavit by the translator stating (their) qualifications and that the translation is accurate"]). However, the specific rules applicable to facial sufficiency of misdemeanor informations are found in the CPL and the governing provisions do not require a certificate of translation or the affidavit of a translator.  CPLR 2101 (b) cannot be used to override those specific requirements (*see People v Douglas*, 162 AD3d 1212, 1214 [3d Dept 2018], *lv denied* 31 NY3d 1147 [2018]), and we decline to effect that result by judicial fiat (*see* Rivera, J., dissenting op at 19-20; *but see* Wilson, J., dissenting op at 3 n 2).[3]

As both informations were facially sufficient, we hold that the courts below properly denied Slade's CPL 30.30 motion, but erroneously granted Brooks's statutory speedy trial motion.

### b.  Allen

While the accusatory instruments in *Slade* and *Brooks* contain no facial indication that a translation occurred, in *Allen*, the complainant stated in her supporting deposition that she had the one-page English-language statement read to her in Spanish by a police

---

[3] Given our conclusion, we need not address the reviewability or merits of the People's argument that Uniform Rules for Trial Courts (22 NYCRR) § 200.3 violates the New York Constitution.

officer. Allen argues that this creates an additional layer of hearsay, and that the hearsay character of the facts alleged in the supporting deposition is therefore facially apparent. We disagree.

Hearsay, of course, is "an out-of-court statement admitted for the truth of the matter asserted" (*People v Buie*, 86 NY2d 501, 505 [1995]), and the hearsay rule generally prohibits the introduction of such statements at trial (*see People v Salko*, 47 NY2d 230, 239 [1979]). In the accusatory instrument context, the focus is on whether the person making the statement had first-hand personal knowledge of the events described or whether the third-party statement falls within a hearsay exception (*see Casey*, 95 NY2d at 361; *Matter of Edward B.*, 80 NY2d at 462-463). The issue here is whether a witness's use of a translator creates a layer of hearsay that runs afoul of the CPL's facial sufficiency requirements for misdemeanor informations.

Other courts have grappled with the applicability of the hearsay rule to testimony related through an interpreter. In the context of trial testimony by a witness relating to statements that were interpreted to him, the Second Circuit concluded that, "[e]xcept in unusual circumstances, an interpreter is 'no more than a language conduit and therefore [the interpreter's] translation [does] not create an additional [layer] of hearsay'" (*United States v Lopez*, 937 F2d 716, 724 [2d Cir 1991], quoting *United States v Koskerides*, 877 F2d 1129, 1135 [2d Cir 1989]; *see United States v Martinez-Gaytan*, 213 F3d 890, 892 [5th Cir 2000]). Courts have applied this rule to declarants when "[t]here is nothing in the record to suggest that the interpreter had any motive to mislead or distort, and there is no

indication that the translation was inaccurate" (*Koskerides*, 877 F2d at 1135). Put another way, in those circumstances, the interpreter is treated as the declarant's agent (*see Lopez*, 937 F2d at 724; *United States v Da Silva*, 725 F2d 828, 831-832 [2d Cir 1983]; *see also People v Quan Hong Ye*, 67 AD3d 473, 473 [1st Dept 2009], *lv denied* 14 NY3d 804, 807 [2010]). This Court has signaled that the "agency rationale" is a "tenable theory for admitting interpreted testimony" (*People v Romero*, 78 NY2d 355, 362 [1991]).

We conclude that, when evaluating the facial sufficiency of an accusatory instrument, no hearsay defect exists where, as here, the four corners of the instrument indicate only that an accurate, verbatim translation occurred, and the witness or complainant adopted the statement as their own by signing the instrument after the translation (*see Matter of Shaquana S.*, 9 AD3d at 466-467; *People v Ventura*, 250 AD2d 403, 404 [1st Dept 1998], *lv denied* 92 NY2d 931 [1998]; *cf. Matter of Edward B.*, 80 NY2d at 463 [supporting deposition contained latent hearsay defect even though the complainant signed the document because the complainant "had never read—nor been read—its contents"]). In *Allen*, the complainant's deposition states facts supporting the information in a first-person narrative and nothing on the face of the deposition provides any reason to doubt that a precise translation occurred. Therefore, the police officer's translation of the complainant's first-hand account did not create a level of hearsay for pleading purposes. Rather, the officer merely acted as a language conduit for the complainant's factual assertions.

In sum, the information in *Allen* contained no hearsay defect for pleading purposes. It was facially sufficient and no further documentation, including a certificate of translation, was necessary for conversion. Allen's motion to dismiss was therefore erroneously granted.

## III.

In an effort to make the hearsay rules for misdemeanor informations somehow sacrosanct, the dissents distort the CPL's statutory framework and ignore the purpose of the procedural requirements for the factual portion of those informations—which is to give a defendant "notice sufficient to prepare a defense" and "to prevent a defendant from being tried twice for the same offense" (*Casey*, 95 NY2d at 360). As an initial matter, an accusatory instrument does not "establish the truth" (Wilson, J., dissenting op at 4). Rather, the CPL requires, for a prima facie case, non-hearsay allegations that "establish, *if true*, every element of the offense charged and the defendant's commission thereof" (*Casey*, 95 NY2d at 360 [emphasis added] [internal quotation marks and citation omitted]). The truth-seeking function is for the factfinder at trial. Nor does the non-hearsay pleading requirement protect against arrest (*see id.* at 364 ["a misdemeanor complaint, which may include hearsay, (may) serve not only as the basis for initiating a criminal action, but also for issuance of an arrest warrant"]; CPL 120.20 [1]; *but see* Wilson, J., dissenting op at 2). Likewise, a violation of the non-hearsay rule is both curable and waivable (*see Casey*, 95 NY2d at 362), yet our dissenting colleagues conclude that a violation somehow rises to the level of rendering a misdemeanor information "a legal nullity" and "void ab initio,"—a

drastic remedy[4] that is invoked without any foundation or indeed citation (Rivera, J., dissenting op at 2; *see id.* at 16; Wilson, J., dissenting op at 12 [joining Judge Rivera's dissent]).

As we made clear in *Casey*, "[p]leading errors involving omission of elements of the charged crime are fundamental" because they "impair a defendant's basic rights to fair notice sufficient to enable preparation of a defense and to prevent double jeopardy" (95 NY2d at 366).  By contrast:

> "Hearsay pleading defects do not implicate any of those basic rights of an accused.  Indeed, . . . both statutory and decisional law have recognized that a criminal prosecution can validly proceed on a hearsay-based accusatory instrument.  We have even held that the statutory right to be prosecuted on a non-hearsay accusatory instrument can be waived by implication"

(*id.*).

---

[4] For example, this Court has concluded that an accusatory instrument is void when the prosecutor knew "that the only evidence supporting the accusatory instrument was false" (*People v Hansen*, 95 NY2d 227, 232 [2000]).  Similarly, in *People v Leto* the indictment was declared void ab initio where defendant's constitutional privilege against self-incrimination was violated at the grand jury stage (*see* 70 Misc 2d 218, 220 [Albany County Ct 1972], *affd* 41 AD2d 877 [3d Dept 1973]; *compare People v Mayes*, 19 Misc 3d 48, 51 [App Term, 2d Dept, 9th & 10th Jud Dists 2008], *lv denied* 10 NY3d 936 [2008], quoting *People v Hameed*, 88 NY2d 232, 239 [1996], *cert denied* 519 US 1065 [1997] ["consideration of hearsay allegations for the purpose of ascertaining the sufficiency of a pleading would in no event constitute a violation of the Confrontation Clause, since 'the right to confrontation is a *trial* right available against witnesses *at trial*'"]).  Defendants make no constitutional arguments, and, of course, whether a defendant, or even most defendants, facing misdemeanor charges ultimately opt to plead guilty (*see* Rivera, J., dissenting op at 17; Wilson, J., dissenting op at 7), does not add a constitutional dimension to a pleading requirement.

Proper application of the CPL's non-hearsay pleading requirement simply does not support a conclusion that any involvement by a translator or interpreter to facilitate the recording of a first-party witness statement at the pleading stage mandates some complex authentication method such as the layers of additional steps imposed by the motion court in *Allen* (*see* Rivera, J., dissenting op at 19-20; Wilson, J., dissenting op at 3 and n 2, 11-12). Although endorsed by the dissents, that process of translating and re-translating the affidavit, and certifying and qualifying the translator (*see id.*), is neither required nor envisioned by the CPL. Instead, the dissents would have the Court graft this impractical procedure onto the statute (*see id.*). In the end, we will have to respectfully disagree with our dissenting colleagues as to what constitutes a "commonsense" and "straightforward" approach to the filing of an affidavit in support of a misdemeanor information (Wilson, J., dissenting op at 4; Rivera, J., dissenting op at 20).

IV.

Our holding with respect to translators and interpreters and hearsay, limited to the context of drafting accusatory instruments at the pleading stage, is consistent not only with our precedent but with sound policy. As of 2011, approximately 2.5 million New York residents had limited-English proficiency, "which means they do not speak English as their primary language and have limited ability to read, speak, write[,] or understand English" (Executive Order [A. Cuomo] No. 26 [9 NYCRR 8.26]). Limited-English proficiency presents "potential barriers to accessing important government programs or services" (*id.*), including police protection. As one study noted, limited-English proficiency may "prevent

many individuals from approaching police for assistance or to report victimization" or, if they do come forward, those victims "may be turned away when trying to report a crime in a language other than English" (*Translating Justice: A Unified Language Access Blueprint to Accessing Justice*, at 4-5, https://reachingvictims.org/wp-content/uploads/2019/09/Translating-Justice-Introduction.pdf [last accessed Apr. 28, 2021]).  Moreover, "New York State residents speak 168 distinct languages and countless dialects" (*People v Aviles*, 28 NY3d 497, 504 [2016]).  New York's language diversity may lead to greater challenges for those who speak a language or dialect for which interpreters are difficult to locate, or who attempt to report a crime in a county without "a professionalized class of interpreters" (Rivera, J., dissenting op at 7).

While rejecting judicially-created barriers to reporting crime for persons with limited-English proficiency, our conclusion that a certificate of translation is not required to convert a complaint into an information does not prejudice a defendant's statutory right to be prosecuted by a facially sufficient information that "contains allegations establishing a legally sufficient case" (*People v Alejandro*, 70 NY2d 133, 139 [1987]; *see Matter of Edward B.*, 80 NY2d at 464) or to vigorously challenge at trial the allegations asserted in the accusatory instrument.  Nor do our holdings addressing an accusatory instrument's facial sufficiency preclude a defendant who discovers such a specific translation-related latent hearsay defect in the accusatory instrument before trial from using other options available under the CPL, if the circumstances warrant, to ensure that the supporting deposition meets statutory requirements (*see e.g.* CPL 170.30).  Here, however, no

defendant raised credible and particularized allegations of a translation-related latent hearsay defect, whether stemming from an inaccurate translation, a misunderstanding in the verification process, or some other flaw.

Accordingly, in *Slade*, the order of the Appellate Term should be affirmed. In *Brooks* and *Allen*, each order of the Appellate Term should be reversed and the case remitted to the respective motion court for further proceedings in accordance with this opinion.

RIVERA, J. (dissenting):

These appeals present a systemic problem arising in prosecutions where the

sufficiency of the accusatory instrument depends on supporting depositions by persons who

lack English-language proficiency. In such a case, the prosecution must timely file

supporting documentation that the deponent's statement was accurately translated, otherwise the accusatory instrument is based on hearsay in contravention of the Criminal Procedure Law (CPL). The accusatory instrument is a legal nullity without proof that the deponent understood and adopted the allegations ascribed to them. This fundamental flaw is not subject to our prior "latent defects" analysis because the instrument is void ab initio.

There are two ways to ensure proper translation for a complainant or witness who does not understand spoken or written English. Law enforcement officials could follow the approach of the Civil Practice Law and Rules (CPLR) and secure a written verified statement under oath in the complainant's or witness's primary language. That statement would then be translated into a written English version and filed along with the translator's affidavit asserting the translator's qualifications and affirming the accuracy of the translation (CPLR 2101 [b]).

Another method would be for the translator to read the English-language complaint to the deponent in a language they understand. But this course requires that the interpreter affirm, in writing, their qualifications, as well as affirm that they provided an accurate oral translation and that the deponent confirmed that what the translator read to them truthfully communicated the deponent's version of events. In other words, the deponent must adopt the translated content as their own, which requires a showing that the translator could, and did, accurately convey that content to the deponent.

Law enforcement officials in these appeals followed neither course. Therefore, I would reverse the Appellate Term and grant defendant Kenneth Slade's CPL 30.30 motion to dismiss, as the prosecution's failure to timely file documents adequately setting forth the

accuracy of the translation of the complainant's allegations rendered the prosecution's assertion that it was trial-ready illusory. For the same reason, I would affirm the Appellate Term's dismissal of the misdemeanor complaint against defendant Kieth Brooks (aka Keith Brooks). I would also affirm its dismissal of the accusatory instrument charging defendant Charo N. Allen as facially insufficient because the translator's statement failed to set forth his qualifications or affirm that the translation was accurate.

## I.

## A.

New York is home to one of the most linguistically diverse populations in the country, with nearly a third of New Yorkers speaking a language other than English at home.[1] Indeed, Queens County in New York City has perhaps the most linguistically diverse population in the world, with several hundred languages spoken throughout the borough.[2] After English, Spanish is by far the most common language spoken in New York; nonetheless, approximately one in six New Yorkers speaks a language other than English or Spanish at home (US Census Bur., *Types of Language Spoken at Home in New York*).[3] Concomitant with this dazzling linguistic diversity is the reality that many of the

---

[1] US Census Bur., 2019 Am. Community Survey, *Types of Language Spoken at Home in New York*, 2019, https://data.census.gov/cedsci/profilechartwidget?geoID=0400000US36&metricFormat= percent&topic=Language%20Spoken%20at%20Home&type=bar (last accessed Apr. 7, 2021).

[2] Emily Davenport, *Queens is the language capital of not just NYC, but also Earth: World Economic Forum*, QNS, Mar. 24, 2017, https://qns.com/2017/03/queens-language-capital-not-just-nyc-also-earth-world-economic-forum/ (last accessed Apr. 7, 2021).

[3] The ten most commonly spoken languages in New York among those with limited English proficiency, in descending order by number of speakers, are Spanish, Chinese,

speakers of those languages are not fully, or at all, proficient in the English language. In 2011, for instance, around 2.5 million New Yorkers had limited ability to speak, read, write, or understand English (Executive Order [A. Cuomo] No. 26 [9 NYCRR 8.26]), which amounts to around one in eight people in the state having limited English proficiency.[4]

Limited English proficiency "present[s] potential barriers to accessing important government programs or services" (9 NYCRR 8.26). Recognizing that "the public safety, health, economic prosperity, and general welfare of all New York residents is furthered by increasing language access to [s]tate programs and services," New York State has "committed to ensuring that language access services are implemented in a cost effective and efficient manner" (*id.*).[5] In particular, absent qualified interpreters and translators, the inability to speak, read, or understand English can constitute a significant stumbling block to accessing justice (*see e.g. Translating Justice: A Unified Language Access Blueprint to Accessing Justice*, at 2 ["(A)ll too often, these victims (who have limited English proficiency or are Deaf or hard of hearing) are denied access to critical services and

---

Russian, Yiddish, Bengali, Korean, Haitian Creole, Italian, Arabic, and Polish (*see* State of New York, *Language Access Policy*, https://www.ny.gov/language-access-policy [last accessed Apr. 8, 2021]).

[4] Jie Zong & Jeanne Batalova, *The Limited English Proficient Population in the United States in 2013*, Migration Policy Inst., Jul. 8, 2015, https://www.migrationpolicy.org/article/limited-english-proficient-population-united-states-2013#Distribution%20by%20State (last accessed Apr. 7, 2021).

[5] Defendants make no claim that the actions here violate New York Executive Order 26.1, which requires executive state agencies that provide direct public services to offer interpretation and translation services for speakers of the ten most common languages spoken in the state by those with limited English proficiency.

supports because . . . justice-related systems do not understand how to provide comprehensive language access, including their legal and ethical obligations to do so for all crime victims"]). As one report has noted, in some cases, "law enforcement officials may speak too fast, or use unfamiliar terminology, increasing the possibility of losing meaning in interpretation or translation, and making an already tense and traumatic situation even more stressful for the victim" (*id.* at 5).

## B.

Translation is no simple task.[6] Rather, it is a professional discipline that requires training, certification, and continued practice. According to the National Center for State Courts, interpreters for legal proceedings must "possess an educated, native-like mastery of both English and another language" and "display wide general knowledge, characteristic of what a minimum of two years of general education at a college or university would provide" (Natl. Ctr. For State Courts, *Court Interpreter Resources*, https://www.ncsc.org/education-and-careers/state-interpreter-certification [last accessed Apr. 7, 2021]). New York State's Unified Court System requires court interpreters to

---

[6] "Translation" conveys the meaning of a written document from one language to another, while "interpretation" conveys the meaning of either spoken or signed language into another spoken or signed language (*see* Merriam-Webster Online Dictionary, translation [https://www.merriam-webster.com/dictionary/translation] [last accessed Apr. 8, 2021]; *id.*, interpret [https://www.merriam-webster.com/dictionary/interpret] [last accessed Apr. 8, 2021]). These methods of communication are different but often mischaracterized as interchangeable. For purposes of my analysis, I apply the federal Department of Justice's definition that "[i]nterpretation is the act of listening to something in one language (source language) and orally translating it into another language (target language)" (67 Fed Reg 41461 [2002]) and that translating includes the act of conveying a written document's meaning by spoken word or sign language.

"possess native-like mastery of both English and the target language," and demonstrated qualifications, evaluated by written and on occasion oral examination.[7] In addition to establishing that they possess the requisite skill to work as an interpreter within the legal system, court interpreters must also execute and file a constitutional oath of office to faithfully discharge the duties of their position. Providing high-quality translation and interpretation services is an essential component of ensuring access to justice for all New Yorkers, irrespective of the languages they do (or do not) speak fluently. Indeed, the state has a legal obligation to provide language access services in both criminal and civil matters, for *all* participants in the judicial process, including defendants, parties, witnesses, victims, and those who utilize non-courtroom services provided by the courts (*see* Uniform Rules for Trial Cts. [22 NYCRR] § 217.1 [a] & § 217.2).

Given the important interests at stake when non-English-speakers seek to access court services, the state court system relies on a cadre of trained and certified professionals. Such an approach is in keeping with best practices for safeguarding the rights of individuals with limited English proficiency. As a general rule, merely "[b]eing bilingual does not mean someone is able to interpret"; rather, "[i]nterpreters need to be trained on different methods of interpreting and terminology" (Vera Inst. for Justice, *Bridging the Language Divide: Promising Practices for Law Enforcement* [Feb. 2009] at 8).

---

[7] *See* Written Test of English Language Proficiency and Legal Terminology For Per Diem Court Interpreters in Languages Other than Spanish, General Information, http://ww2.nycourts.gov/sites/default/files/document/files/2018-05/English%20Language%20Proficiency%20Sample%20Questions.pdf (last accessed Apr. 7, 2021).

The federal Department of Justice and the American Bar Association similarly recommend the use of a formal certification process to ensure the adequacy of interpreters, as "(c)ompetency requires more than self-identification as bilingual" (Am. Bar Assoc. Standards for Language Access in Courts, Standard 8 Commentary, quoting DOJ LEP Guidance at 41,461; *see also* Legal Services NYC, Civil Justice Initiative, *Interpreting Justice: Language Access in the New York Courts* [2016] ["(L)itigants should never have to rely on non-professional interpreters. A bilingual person without proper training or a legal background is simply not equipped to provide the kind of precise interpretation that a legal setting requires"]). Indeed, a bilingual person "may be able to communicate effectively in a different language when communicating information directly in that language, but not be competent to interpret in and out of English" or "do written translations" (67 Fed Reg 41461 [2002]).

The use of a professionalized class of interpreters guarantees that any individual engaging the legal system may rest assured that they are receiving interpretation services of the highest caliber. As the Vera Institute of Justice and other organizations have found, when law enforcement fails to provide competent interpreters and translators, victims of crime are often forced to rely on impromptu translation and interpretation provided by untrained individuals—including those who know the victim (*see Translating Justice* at 5 ["In other cases, an LEP victim's privacy is commonly compromised because police officers, unable to understand that victim's native language, often include neighbors, intimate partners, or family members to interpret the victim's case"]). By contrast, New York's *Court Interpreter Manual and Code of Ethics* makes clear that interpreters shall

"avoid even the appearance of impropriety" by disclosing "any prior contact the interpreter has had with any of the parties or jurors, as soon as [they are] aware of it," including even "seemingly unimportant [contacts, such] as merely recognizing someone in the courtroom from the interpreter's neighborhood, who the interpreter does not actually know" (NY State Unified Court System, *Court Interpreter Manual and Code of Ethics* [2018] at 8). Thus, providing appropriate language access services demands that interpreters and translators be proven competent in both the technical requirements of the role as well as the broader ethical concerns inherent in their office. An individual's mere assertion that they are bilingual is far from sufficient to establish that they can undertake the exacting task of translating in situations where faulty interpretation may lead to severe adverse consequences.

II.

In each of these appeals, the prosecution filed misdemeanor complaints without sufficient documentation of the nonhearsay factual allegations necessary to convert the complaints to informations in accordance with the CPL (*see* CPL 100.40 [1]; 100.15). Specifically, the prosecutors failed to timely submit documentation asserting the qualifications of the translators and the accuracy of their translations. Without that documentation, the accusatory instruments' factual allegations consisted of law enforcement officers' hearsay descriptions of the deponents' assertions. In each case, because of this lack of proper documentation, the prosecution failed to convert the accusatory instruments to informations before expiration of the CPL 30.30 speedy trial deadline.

In defendant Slade's case, the victim signed a complaint, written in English, which was filed as a supporting deposition attached to the accusatory instrument. At arraignment, the prosecution announced that it was ready for trial based on the complaint.

Although a certificate of translation was prepared along with the complaint, it was not served on defendant or filed until two years later, in response to defendant's request that the prosecution produce the document. The certificate states,

> "I, [NM], state that on 01/09/2014, I translated the contents of the accusatory instrument against the above named defendant to [defendant's wife] in the Spanish language and also translated the fact that false statements made therein are punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law. After translating the accusatory instrument to [defendant's wife] he/she indicated to me that he/she understood what was translated."

The court denied defendant's CPL 30.30 motion to dismiss, rejecting defendant's argument that the prosecution had failed to convert the accusatory instrument and that its declaration that it was ready for trial was illusory. The Appellate Term affirmed, concluding that the certification was unnecessary because the accusatory instrument did not reveal that the complainant was unable to understand the English-language factual allegations attributed to her.

In contrast, the prosecutor in defendant Brooks's case filed an off-calendar readiness statement along with two supporting depositions in English and a certificate of translation before the CPL 30.30 time period expired. The witness's deposition states,

> "I, [C.A.] say that I have read the complaint filed in the above-entitled action and attached hereto and that the facts stated in that complaint to be on information furnished by me are true upon my personal knowledge."

As the certificate makes clear, the witness's deposition statement is inaccurate because the witness did not and could not read the complaint in English. The certificate states,

> "I, [V.S.], state that on 4/26/2016, I translated the contents of the accusatory instrument against the above-named defendant to [C.A.] in the Spanish language and also translated the fact that false statements made therein are punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law. After translating the accusatory instrument to [C.A.], he/she indicated that he/she understood what was translated."

Criminal Court held that the filing was deficient because the certificate failed to set forth the translator's qualifications. The court informed the prosecutor that the People would be charged with time under CPL 30.30 until they submitted the proper documentation because, without it, the accusatory instrument could not be converted to an information. The prosecutor never submitted the requested documentation, the statutory speedy trial period elapsed, and the court granted defendant's motion to dismiss the accusatory instrument.

The Appellate Term affirmed, concluding that the witness's inability to understand English was apparent from the filing of the translator's statement. The Court found that the translator's statement, however, was insufficient to convert the instrument to an information because it did not comply with CPLR 2101(b), and the prosecution failed to provide adequate documentation before expiration of the maximum time allowed under CPL 30.30.

Unlike the certificates filed against Slade and Brooks, which make no reference to the respective translator's ability, the affidavit of translation filed with the accusatory

instrument in defendant Allen's case asserts that the translator "understand[s]" the source and target languages. The accusatory instrument indicates that defendant's arrest was "based on the sworn statement taken by" the complainant. The prosecutor attached to the instrument a handwritten deposition prepared by someone other than the deponent, which states, "I have had this statement consisting of 1 page read to me in Spanish by P.O. [A.M.] and I sware [*sic*] that this is the truth." In response to defendant's motion to dismiss the accusatory instrument on the grounds that it contained hearsay and was therefore facially insufficient, the prosecution filed an affidavit of translation from the officer who purportedly interpreted for the complainant, stating,

> "I, [A.M.], swear that I understand the English language and the Spanish language. On 11/01/17, I acted as a translator for [R.V.]. The attached English written statement of [R.V.], dated 11/01/17, is a true and accurate translation by me of the Spanish spoken statement taken from [R.V.]. I reviewed the written English statement with [R.V.] by translating the written English statement into Spanish. [R.V.] indicated that the English statement was accurate and signed the English statement in my presence."

The court directed the prosecutor to file a superseding information that included the original statement from the complainant, with both its substance and verification in Spanish; an English-language translation of that affidavit; and another affidavit from Police Officer A.M. detailing his qualifications to translate and swearing to the accuracy of his translation. The prosecution twice refused to file the requested documents, instead moving to reargue. After the court denied the prosecution's motion to reargue and instructed it to comply with the process the court had set forth for properly converting the complaint, the prosecution again refused to comply with the judicial order. The court then granted

defendant's motion to dismiss. The Appellate Term affirmed, holding that a certificate of translation was required to cure the hearsay defect and that the prosecution's submission was insufficient.

III.

In *Matter of Edward B.*, this Court concluded that an accusatory instrument contains hearsay when a law enforcement official "edit[ed] and revis[ed] the complainant's version of events before transcribing it" (80 NY2d 458, 462-463 [1992]). The deposition contained "the [official's] interpretation of what the complainant had told her. Thus, . . . the deposition . . . was in truth nothing more than a statement written by a law enforcement officer reporting what [they] ha[d] been told by an eyewitness—in other words, hearsay" (*id.* at 463 [internal citation omitted]). Without the complainant having "read—nor been read" the document, "she never learned what the document actually said" (*id.*). Thus, her signature did not transform the official's interpretation into a nonhearsay statement. This reasoning applies with equal force here.

As the Court in *Matter of Edward B.* further explained, by analogy to CPL 100.40, which requires that the accusatory instrument be facially sufficient, "[t]he purpose of requiring nonhearsay allegations establishing every element of the charged crimes is to assure that there exists a sound and supportable basis for subjecting the accused to a trial" (*id.* at 464 [internal citation omitted]). The Court's recognition of the importance of that assurance in a juvenile delinquency proceeding is no less true for the adult proceedings at issue in these appeals: "The need for such assurance is particularly acute at the outset . . . where there is no independent Grand Jury-like body to review the evidence and the petition

is often the sole instrument upon which the [accused] is prosecuted" (*id.* at 464-465 [alteration in original]).

Although the Court ultimately concluded that the hearsay in the accusatory instrument was a "latent defect" because it was not obvious from the face of the complaint, that part of the holding has no application to these appeals. In contrast to *Matter of Edward B.*, the fatal deficiencies here were discovered *before* trial, not in the middle of fact-finding when a witness could adopt the hearsay allegations as their own while testifying. This Court's subsequent holding in *Matter of Nelson R.* (90 NY2d 359 [1997]) does not alter this analysis because the defective accusatory instruments here are deficient in two regards: first, like the accusatory instruments in *Matter of Edward B.*, the misdemeanor complaints contained hearsay allegations that would ordinarily preclude conversion; second, as I discuss, the failure to establish—even minimally—the qualifications of the translators casts doubt on whether the instruments were *ever* verified pursuant to CPL 100.15 and 100.30. Thus, here, the accusatory instruments may have been insufficient from the very outset. In contrast, there was no doubt that the accusatory instrument in *Matter of Nelson R.* had been verified by the complaining witness; rather, the dispute turned on whether the complainant was competent to undertake that verification. Given these legally significant differences, there is simply no merit to the majority's contention that my analysis was "specifically rejected" by *Matter of Edward B.* and *Matter of Nelson R.* (majority op at 9).

Nevertheless, the majority adopts the prosecutors' argument that they complied with the CPL because the translators affirmed that they translated the English-language written statements in the depositions into Spanish for the complainants in *Slade* and *Allen* and the

witness in *Brooks*. The speakers then signed documents confirming that they agreed with the translated versions. The documentation, however, is insufficient to support conversion of the accusatory instruments to valid informations.

While it is true that the certificates of translation in Slade's and Brooks's prosecutions say that, "after translating the accusatory instrument to [the Spanish-speaking complainant] he/she indicated to me that he/she understood what was translated," the certificates do not include any assertion of the translator's qualifications. This absence is fatal, as it means that there is simply no way to know whether the translators even had the linguistic skills to accurately translate the statement in the first place or whether they correctly interpreted the speakers' responses to the translation as an indication that they "understood what was translated." Without a basis for evaluating each of these translators' ability to accurately communicate the contents of the document, there is no way of knowing whether the speaker "learned what the document actually said" (*Matter of Edward B.*, 80 NY2d at 463). The signatures are not attestations to the accuracy of the translations—nor could they be, as the signed complaints were in a language that the complainants and witness concededly did not understand.

While the translator in Allen's case asserts that he "understand[s] the English language and the Spanish language," he makes no assertion as to the basis for his understanding of both languages, nor does he assert that he possesses the skills required to translate between the two. As I have discussed, translation takes skill, and because self-identification as bilingual is insufficient (*see* 67 Fed Reg 41461 [2002]), a vague assertion of some unknown level of "understanding" is similarly inadequate. It may be that a person

"understands" a language because they grew up speaking it with family and friends but received no formal training in the language; or perhaps they have only taken one or more introductory language courses but lack the specialized vocabulary required to translate sophisticated legal concepts;[8] or, even if they understand the language, they may not know the basic principles of proper interpretation and translation.

The certificates in these appeals fail to illuminate the translators' capacity to correctly translate the written English statements into Spanish or their ability to understand the Spanish speakers' responses. For all we know, the translators' renditions of the English-language allegations diverged significantly from their written form—discrepancies that would never have become apparent to a monolingual, Spanish-speaking complainant or witness. Therefore, the accusatory instruments are based on hearsay, as there is nothing in the record establishing the competency of the translators and, consequently, no basis for believing that the witnesses ever "learned what the document actually said" (*Matter of Edward B.*, 80 NY2d at 462-463).

The accusatory instrument in *Brooks* is also insufficient because the witness swore that he read the English-language complaint—a patently untrue statement in light of the

---

[8] For instance, the CPL requires that, in order for conversion to be properly effectuated, a supporting deposition must convey to the witness a form notice indicating that "false statements made therein are punishable as a class A misdemeanor" (CPL 100.30 [1] [d]). This essential element of the conversion process must be comprehended by the witness, otherwise no proper verification has occurred. But even this short statement contains legal jargon that may be beyond the ken of an untrained speaker of a language attempting to interpret on the fly (*see e.g.* Vera Inst. of Justice & New York City Mayor's Office, *Translating Justice: A Spanish Glossary for New York City* [providing translations of various legal terms from English into Spanish, including "Misdemeanor" and "Falsely reporting an incident"]).

certificate of translation stating that the accusatory instrument was translated into Spanish for him. Nevertheless, the majority suggests that it is possible that the witness could read the complaint. The record is to the contrary. Unlike in *Slade*, the prosecutor here makes no assertion that the witness was competent to read and understand the English-language version of the complaint, and the drafting of the certificate of translation—let alone filing it—would have been wholly unnecessary if he actually did read and comprehend the allegations written in English.

Additionally, none of the supporting documents in these appeals contain any assertions as to the translator's impartiality or lack of relationship to the victim or defendant. Although the translator in Allen's case appears to have been a police officer, we know nothing but the names of the translators in Slade's and Brooks's cases. It is thus unclear whether these translators were competent professionals or merely relatives, neighbors, or friends of the deponent. The majority's assumption that the translators are unbiased has no support in the record (majority op at 14).

Our jurisprudence that a court assess the sufficiency of an accusatory instrument by reference to the face of the document, relying only on what is set forth within its four corners has no application to these appeals, where the accusatory instruments are void from their inception. The widespread use of interpreters and translators in the criminal justice system, along with the difficulties in ensuring the skill and accuracy of those translators, is not a "latent defect," one that need only be addressed on a case-by-case basis due to the unique circumstances of the defect, in light of the totality of the circumstances. Instead, proper translation of a complainant's or witness's statement from its written English

version to an accurate oral version in a language understood by the complainant or witness requires a general rule that addresses this widespread problem with common elements.

I can find no reason why a court faced with these deficiencies—noting this systemic problem—cannot request submission of an accusatory instrument with an assertion of the translator's qualifications attached. Although the *Edward B.* Court declared that the complainant's signing of a supporting deposition under oath that she "had never read or been read its exact contents *are not to be endorsed or condoned*" (80 NY2d at 464 n 2 [emphasis added]), the majority does exactly that here. The majority concludes that the CPL does not require a statement of the translator's qualifications, and then goes further and holds that the CPL requires no certificate of translation at all (majority op at 18). In other words, even though an accusatory instrument's English-language allegations exist *solely* because of the work of a translator, the majority today permits the prosecution to completely hide the fact of the translator's existence from the defendant. In so doing, the majority incentivizes the actions the *Matter of Edward B.* Court sought to eliminate by its rebuke.

Moreover, the majority's assurance that nothing in its opinion "prejudice[s] a defendant's statutory right to be prosecuted by a facially sufficient information . . . or to vigorously challenge at trial the allegations asserted in the accusatory instrument" rings hollow (majority op at 18). "Criminal justice today is for the most part a system of pleas, not a system of trials" (*Missouri v Frye*, 566 US 134, 144 [2012] [internal citation and quotation marks omitted]). Because a defendant facing a misdemeanor prosecution is overwhelmingly more likely to resolve the case by plea than by trial, the majority's

tolerance of accusatory instruments that are utterly silent as to the fact that the allegations contained therein were translated by some unknown individual of unknown skill is especially troubling. And the majority's assertion that there are pretrial remedies for a defendant who "discovers such a specific . . . defect" in the translation (majority op at 18), is little comfort given that the majority's approach undermines such discovery. A defendant is unlikely to "discover" the inadequacy of the translation or the translator's skills when, according to the majority, the prosecutor is under no obligation to provide a certificate of translation or any statement of accuracy.[9]

The majority attempts to sidestep the inherent problem with these accusatory instruments, characterizing the translators in these appeals as mere "language conduit[s]" who pose no hearsay complications due to the accuracy of their translations (majority op at 13-14). The majority's reliance on non-binding federal case law to advance this argument is unpersuasive. First, a number of the cases cited by the majority involve interpreters whose qualifications were demonstrated before the trial court (*see e.g. United States v Koskerides*, 877 F2d 1129, 1135 [2d Cir 1989] [describing the official who interpreted as an "employe(e) at the American Embassy in Athens"]; *United States v Martinez-Gaytan,* 213 F3d 890, 892 [5th Cir 2000]). In any event, as the Fifth Circuit recognized in *United States v Martinez-Gaytan*, "[i]n determining whether to treat a translator as a mere language conduit," a court will take into account, among other considerations, "the interpreter's qualifications and language skill" (213 F3d at 892). The

---

[9] Certainly, we do not want defendants to make groundless demands when there is no basis to suspect a prosecutor's filing is insufficient.

majority's further reliance on New York cases that hold a translator is "the declarant's agent" is similarly misplaced. There is simply nothing that establishes the translators' qualifications in these appeals and thus their ability to fulfill their sole responsibility as agents: accurately conveying the complainant's or witness's factual allegations from one language into another (*see People v Quan Hong Ye*, 67 AD3d 473, 475 [1st Dept 2009] [explaining that "the interpreting officer testified as to the truthfulness and accuracy of his translation"]; *cf. People v Randazzio*, 194 NY 147, 157 [1909] ["Of course, if there has been an error in correctly interpreting (the defendant's) statement (the defendant) is not bound thereby"]). And, as our case law establishes, the deponents' signatures do not rectify this fatal flaw in the accusatory instrument nor the majority's analysis (*see Matter of Edward B.*, 80 NY2d at 463).

IV.

The systemic problem highlighted in these appeals can be avoided by application of protocols that further the purpose of the CPL "to assure that there exists a sound and supportable basis for subjecting the accused to a trial" and also comport with best practices in the field of translation (*Matter of Edward B.*, 80 NY2d at 464). One approach requires that the complainant or witness prepare and affirm a written statement in their native language, with a verification of its accuracy under penalty of perjury pursuant to CPL 100.30 (1) (d). The document must then be translated into a written English affidavit by a person qualified to translate from the witness's native language into English. Both documents must then be filed with the accusatory instrument, along with a verified written statement by the translator asserting their qualifications and affirming that the translation

is accurate. This process is well known by the bench and bar, as it is codified in CPLR 2101 (b).

Alternatively, because the Criminal Procedure Law, unlike the CPLR, merely requires that the complainant or witness verify under oath the statements ascribed to them, and our Court has accepted statements in accusatory instruments that are read by or read to the deponent who then swears that the statement is accurate, officials may apply the same approach to a non- or limited-English proficient deponent (*Matter of Edward B.*, 80 NY2d 458, 461 [1992]). This requires that a qualified translator memorialize the witness's statement in a written English-language document, which must then be read back to the witness in a language they understand by the same or another qualified translator, making any corrections as noted by the witness. In a written statement, the witness then affirms, under penalty of perjury, the accuracy of the statement read to them in their native language. This written statement must then be filed with the accusatory instrument, along with the translator's written, verified statement describing their qualifications and the accuracy of the translation and affirming that the witness confirmed that the translated statement accurately represents their allegations.

The majority derides these straightforward approaches to ensuring the reliable translation of non-English allegations that form the basis of an accusatory instrument as "layers of additional steps" that would "graft [an] impractical procedure onto the statute" (majority op at 17). In stark contrast to the majority's characterization of certificates of translation as "judicially-created barriers to reporting crime" (*id.* at 18), police and prosecutors *already* utilize the services of translators and interpreters every day, and, as

these appeals demonstrate, certificates of translation are *already* being drafted to memorialize their work.[10] And yet the majority confusingly claims that requiring slight modifications to these certificates to ensure their accuracy would transform them into a "complex authentication method . . . [with] layers of additional steps" (*id.* at 17). That these translators should be required to include in their certificates and affidavits a few additional sentences affirming both the accuracy of their translations and their competency to translate hardly constitutes some insuperable hurdle.[11]

In any event, law enforcement officials did not employ either of these approaches in the appeals before us. Nor do the prosecutors argue that they were *unable* to comply with either approach in the time allotted under CPL 30.30; instead, they simply chose not to do so—even, as in *Brooks* and *Allen*, when directed to do so by the court. Consequently, in each case, the supporting documentation fails to demonstrate that a qualified person accurately translated the deponents' factual allegations. As such, the deponent could not

---

[10] Moreover, the majority's perplexing claim that incentivizing accurate translation somehow *inhibits* the reporting of crimes by individuals with limited-English proficiency is entirely backwards (majority op at 17-18). The majority concedes that linguistic barriers prevent such individuals from seeking police assistance (*id.*), while simultaneously adopting a rule that would tolerate interpretation or translation by anyone, without even the slightest guarantee that they are at all qualified.

[11] The majority claims that its approach "does not prejudice a defendant's statutory right to be prosecuted by a facially sufficient information" (majority op at 18). But, as I have explained (*supra* at 12-13), a misdemeanor prosecution may proceed against a defendant only upon the elimination of hearsay allegations in the complaint, accomplished by strict compliance with the CPL. Requiring there to be some discernible basis for the accuracy of a translation—itself necessary for compliance with the CPL—protects the rights of the accused by ensuring that a witness's limited English proficiency does not undermine the procedural safeguards governing misdemeanor prosecutions. Secondarily, these approaches ensure that victims have the benefit of knowing that their words and experiences are being fully understood by law enforcement.

adopt as their own the English-language statements in the misdemeanor complaint. Therefore, the accusatory instruments contained hearsay and the prosecution failed to timely convert them into informations.

I dissent.

WILSON, J. (dissenting):

Justice depends on truth.  The hearsay rule is one of the many ways in which the judicial system attempts to prevent shaky "facts"—like those in a child's game of

telephone—from distorting the truth. A witness's sworn oath to tell the truth is another; the oath reminds witnesses of the gravity of false testimony and the need for the whole truth, and nothing but. The Criminal Procedure Law (CPL) employs those and other methods to ensure that innocent individuals are not subject to unjust prosecution. Before a prosecution begins, trial courts must verify that the factual allegations in a complaint fit the crimes as charged (CPL 100.40 [1] [b]). Those allegations in turn cannot be based on hearsay or unsworn facts (CPL 100.15 [1], 100.40 [1] [c]). Only statements given with an awareness of the consequences of perjury, either based on personal knowledge or falling within an established exception to hearsay, meet the statutory requirements for reliability (*see Matter of Neftali D.*, 85 NY2d 631, 636 [1995]).[1]

Those protections are essential. People are routinely arrested and deprived of liberty based solely on the allegations in a complaint or information. Eventual acquittal cannot undo time spent in pretrial detention, the stress of prosecution or the attendant costs. Prosecutions initiated by indictment are tested by a grand jury or other independent arbiter; prosecutions initiated by a complaint or information are not (*People v Alejandro*, 70 NY2d 133, 138 [1987]). Because those untested accusatory instruments are deemed true for the purposes of initiating a prosecution, they must accurately reflect a witness's or victim's

---

[1] Exceptions to the general prohibition against hearsay grow out of "considerations of necessity and trustworthiness" (*People v Kennedy*, 68 NY2d 569, 579 [1986]). As discussed below, the majority's rule meets neither criterion. Translations made by unqualified or unknown translators do not demonstrate the trustworthiness needed to deprive a person of liberty. No compelling necessity excuses the People from providing reasonable assurances that the translation of an accusatory instrument is accurate. Indeed, the People agree that documenting the translation process has been routine for decades and imposes no real burden.

personal knowledge of the events in question (*see id*. at 138 [reviewing the legislature's intent to create a "demanding standard" for the sufficiency of informations]).

The issue here is, in some sense, simple. We live in a multilingual society: our judicial system functions in English. Our ordinary process, requiring a witness or victim to read, review, correct (if necessary) and verify under oath the truth of facts initiating a criminal prosecution, works well for those fluent in English. But when the declarant does not understand English well or at all, our ordinary process cannot safeguard the truth.

The solution is simpler still. In trials and other circumstances when a victim, defendant or witness has limited English proficiency, the judicial system provides qualified translators. The importance of interpretation in the search for truth is evident not only in the substantial resources the judicial system devotes to providing language access, but also in the CPL's treatment of interpreters, who must swear an oath before assisting a court or grand jury (*see e.g.* CPL 190.25 [3] [d]). Lacking instruction from the legislature or our court, the trial courts have developed a simple, practical solution: requiring a minimally sufficient certificate of translation. They have not arrived at a uniform set of rules for the qualifications of translators, the contents and timing of such certificates or the consequences of the failure to provide one, which is where this Court might provide some assistance.[2]

---

[2] I agree with the majority that the CPL does not require the procedures used in civil litigation (*see generally* CPLR 2101 [b]). The CPL does require that an information be supported by verified, non-hearsay allegations. Those requirements dictate that when a translator assists in drafting and verifying a complaint or deposition, the translator must attest to fluency in the relevant languages, and affirm under penalty of perjury that he or she translated the allegations accurately and read them back to the witness along with the

Instead, the majority rejects the trial courts' commonsense solution, preferring a rule at odds with the truth: no certificate of translation is required, even for witnesses who do not understand English at all. The witness's signature is sufficient to establish the truth, even if the witness has no idea what the document says, so long as a reader cannot tell that from the document itself. Even if other evidence available to the court or parties conclusively shows that the witness does not understand English, or that the translator was inept or unable, it is of no moment. Indeed, the prosecution is not required to show that the translator interpreted for the witness the affirmations regarding perjury and false statements that are critical to the sufficiency of an information or complaint (*see* CPL 100.15 [1]; *Neftali D.*, 85 NY2d at 636). In short, the CPL's procedural safeguards for truth now exist only when the victim or witness is fluent in English. The majority has missed the point of these essential procedural safeguards. The majority asserts that the "purpose of the [CPL's] procedural requirements" is not to enhance the trustworthiness of the accusatory instrument but rather to "give a defendant notice sufficient to prepare a defense and to prevent a defendant from being tried twice for the same offense" (majority op at 15 [quotation marks omitted]). If those were the only purposes an accusatory instrument was meant to serve, the verification and non-hearsay requirements would be irrelevant. Unverified rumor or completely fabricated accusations would satisfy those ends, as long as the false accusation was specific enough to put the defendant on notice of

warning that false statements are punishable by law. That requirement constitutes the basic proof needed to ensure that the document has been properly drafted and verified, as required by the CPL.

the baseless crimes charged. According to the majority, that's perfectly fine because eventually the truth will be divined at trial – at least in the 1% of cases that go to trial. That is just not the way the criminal justice system works: the point of the verification and non-hearsay requirements is to prevent the initiation of a criminal prosecution unless it is based on allegations with some guarantee of trustworthiness, even if it is just one side of the story that may be controverted later.[3]

The majority's rule has no basis in the CPL. The term "latent deficiency" cannot be found in it. It is a judicial carveout found in a couple of cases decided under the Family Court Act (*see Matter of Edward B.*, 80 NY2d 458 [1992]; *Matter of Nelson R.*, 90 NY2d 359 [1997]) to the general requirement that the People bear the vital burden of drafting a proper accusatory instrument (*see People v Colon*, 110 Misc2d 917, 920 [Crim Ct 1981], *affd for reasons stated below* 59 NY2d 921 [1983] ["Responsibility to confer upon the Criminal Court jurisdiction to try misdemeanor cases rests squarely upon the shoulders of the District Attorney. Like any other prosecuting litigant in an action of any nature (civil as well as criminal) he must file an accusatory instrument sufficient in its allegations to give the court reason to exercise its jurisdiction"]). Those Family Court cases did not

_____

[3] In a similar misunderstanding of the CPL's safeguards, the majority claims that the hearsay rule is not meant to protect a person's liberty because arrest warrants can be issued based upon complaints that include hearsay (*see* majority op at 15). But the CPL instructs that a defendant must be *released* from custody if the People then cannot obtain the requisite non-hearsay evidence needed to proceed with the prosecution (*see* CPL 170.70 ["Release of defendant upon failure to replace misdemeanor complaint by information"]; CPL 100.40 [1] [c] [information must be supported by non-hearsay allegations]). In other words, the hearsay rule demands the exact protection that the majority attempts to write out of the CPL: freedom from confinement and unjust prosecution.

involve the systemic problem arising out of the court system's need to take evidence from the multitude of people not fluent in English.[4]

Undoubtedly, accurate translation is vital for each of the CPL's protections. The prohibition on hearsay requires direct translation of a witness's or victim's story, not a mere summary (*see Edward B.*, 80 NY2d at 461). The line between mischaracterization and translation rests entirely on the skill of the translator. Similarly, to meet the verification requirement, a translator must read the allegations back to the victim or witness verbatim, along with the accompanying caution against perjury. Without proof of translation and reason to be confident in its accuracy, there is little reason to trust the soundness of the accusatory instrument.[5] The consequences of mistranslation can be dire, not just for defendants, but for victims as well.

---

[4] What is more, *Edward B.* strongly supports the need to cure hearsay defects when they are noted before trial, as was the case here (*see Edward B.*, 80 NY2d at 464-465 ["The purpose of requiring nonhearsay allegations establishing every element of the charged crimes is to assure that there exists a sound and supportable basis for subjecting the accused to a trial. The need for such assurance is particularly acute at the outset of a juvenile delinquency proceeding, where there is no independent Grand Jury-like body to review the evidence and the petition is often the sole instrument upon which the [accused] is prosecuted. On the other hand, once the pretrial stages of the proceeding have passed and the fact-finding stage has begun, there is no longer a pressing need for an accusatory instrument that complies with Family Court Act § 311.2 (3)'s requirements, since the accused has already been brought before the court and the witnesses are available to describe the case against the accused"] [citation omitted]).

[5] When the verification of an information occurs in open court, the CPL permits a trial court to seek assurances that interpreters are skilled. By holding that courts are powerless to seek similar assurances when translations occur out of court, the majority introduces a novel incongruity between in-court and out-of-court verification. That incongruity has no basis in the text or legislative history of the CPL. Why should an out-of-court piece of paper produced under unknown circumstances be more trustworthy than a witness who personally testifies before a judge?

The factual allegations in an information or complaint determine whether a person who is presumed innocent is subjected to prosecution and what crimes are charged. Contrary to the majority's intimations, those factual allegations are almost never tested at trial (*see* majority op at 18)—99 percent of misdemeanor charges are resolved by guilty plea (*see* National Association of Criminal Defense Lawyers & New York State Association of Criminal Defense Lawyers, *The New York State Trial Penalty: The Constitutional Right to Trial Under Attack* at 3 [Mar. 2021], available at https://www.nacdl.org/getattachment/1d691419-3dda-4058-bea0-bf7c88d654ee/new_york_state_trial_penalty_report_final_03262021.pdf [last accessed May 3, 2021]). A mistranslated complaint can add unwarranted counts to the charges against a defendant or make the prosecution's case appear stronger than it is, leading defendants to accept a deal rather than gamble with their lives.

Mistranslation also affects the pursuit of justice for victims, such as when police or prosecutors fail to investigate an incident or a court dismisses for lack of factual support the charges against a defendant, based solely on the miscommunications between investigators and a witness or victim (*see* Ashley Southall, *Police Must Tackle Language Barrier in Domestic Abuse Cases*, NY Times [last accessed May 25, 2017], https://www.nytimes.com/2017/05/25/nyregion/police-tackle-language-barrier-in-domestic-abuse-cases.html#:~:text=Arlet%20Macareno%20still%20gets%20choked,the%20bottom%20of%20the%20stairs [last accessed May 3, 2021] [relating the stories of numerous "women in New York who say they have tried to report (domestic) abuse to the police only to be

foiled by a persistent language barrier that critics say has devastating consequences for victims of domestic violence"]; *see also* Leslye E. Orloff et al., *Battered Immigrant Women's Willingness to Call for Help and Police Response*, 13 UCLA Women's LJ 43, 74 [2003] [reporting that two-thirds of Spanish-speaking domestic violence victims surveyed reported that when police responded to a report of domestic violence they did not attempt to communicate with them in Spanish either directly or through an interpreter]; Karin Wang, Comment, *Battered Asian American Women: Community Responses from the Battered Women's Movement and the Asian American Community*, 3 Asian LJ 151, 164 [1996] [explaining that the lack of language services contributes to underreporting and hesitancy in seeking assistance among domestic violence victims]). In the rare cases when defendants proceed to trial, the victims' credibility can be destroyed by cross-examination with their mistranslated statements. Only a competent interpreter can ensure that the account of the crime laid out in the initial complaint is complete and accurate.

The Uniform Court System's own website announces: "New York is a diverse community of 62 counties with unique linguistic challenges. Aware of this reality, the NYS Unified Court System (UCS) remains committed to improve access to justice for Limited English Proficient (LEP) individuals" (New York Unified Court System, *Language Access and Court Interpreters*, http://ww2.nycourts.gov/COURTINTERPRETER/index.shtml [last accessed May 3, 2021]).[6] But instead of establishing rules to ensure the accuracy of

---

[6] The majority's view of the language rights of victims is strikingly outdated. The "new national consensus" is to ensure that the courts provide language services (U.S. Department of Justice, Civil Rights Division, *Language Access in State Courts* at 14 [Sept. 2016], available at https://www.justice.gov/crt/file/892036/download [last accessed May 3,

complaints or informations based on statements from persons with limited English proficiency, the majority chooses to minimize any inquiry into the truth.

The majority's application of our caselaw demonstrates how far it has strayed from the principle that the judicial process should be guided by the search for truth. The majority cites *People v Hardy* (35 NY3d 466 [2020]) for the proposition that a court should not look beyond the "four corners" of an accusatory instrument when evaluating its sufficiency. In *Hardy*, we held that the CPL does not permit the prosecution to amend the factual allegations made by an out-of-court witness in order to fix a perceived factual error. We explained the legislature's rationale as follows:

> "An information or a complaint—unlike an indictment or superior court information—commences a criminal action based on the allegations of someone who is not an officer of the court, and whose testimony has not been vetted by a grand jury. Under those circumstances, it was reasonable for the legislature to decide that no one but an affiant should be permitted to alter the factual allegations previously sworn to by [that] affiant . . . The CPL does provide its own pathway for correcting factual errors in complaints and informations, through the filing of a superseding accusatory instrument (CPL 100.50), not through a prosecutor's amendment of facts averred by someone else" (*id*. at 472-475).

*Hardy* does not stand for the proposition that a court can never look beyond the four corners of the accusatory instrument to determine the truth. It stands for a very different

---

2021]). In keeping with that imperative, Governor Cuomo recently issued the latest in a series of Executive Orders directing state agencies to expand language access services. Executive Order 26.1 requires "[e]ach executive state agency that provides direct public services . . . to offer interpretation services to individuals in their primary language with respect to the provision of services or benefits" (Executive Order [A. Cuomo] No. 26.1).

proposition, clear from the legislature's insistence that accusatory instruments be supported by facts known to a witness with personal knowledge, sworn to under penalty of perjury: the state controls the preparation and content of an accusatory instrument, and when the state uses its awesome power to initiate a criminal prosecution, we will not tolerate a flawed accusatory instrument, but will require a do-over with any correction to a sworn statement made under oath by the person with first-hand knowledge, even when the correction is as meek as a typographical error. Of course, the risk of error is far higher in the case of an out-of-court translation—conducted by an individual whose skill and identity are entirely unknown—than it is when the court oversees and approves the correction of a typographical error by a court officer.[7]

In keeping with the truth-seeking function of courts, deficiencies in accusatory instruments should be identified and fixed (*id*. at 475 [noting that it is "the People's responsibility to obtain a sworn statement with the correct factual allegations and proceed on a superseding instrument"]). It is the rare deficiency in an accusatory instrument that

---

[7] The majority relies heavily upon *People v Casey* (95 NY2d 354 [2000]) to claim that I have "distort[ed] the CPL's statutory framework" (majority op at 15). In *Casey*, we held that a criminal defendant must object to a hearsay defect in an information before trial, or else any objection will be deemed waived. Contrary to the majority's misreading of *Casey*, we reached that ruling not because hearsay defects are unimportant, but because they are *curable* if a defendant objects (*id*. at 367 [noting that our "case law has emphasized the importance of the *curability of a particular procedural defect* as a factor weighing in favor of requiring preservation"] [emphasis added]). *Casey* reached that decision by distinguishing juvenile delinquency petitions which "cannot be cured by amendment" under the Family Court Act (*id*.). Today, the majority holds that trial courts are powerless to cure deficiencies in the CPL's verification and non-hearsay requirements. The majority has left *Casey* far behind.

we should find irrelevant, given the CPL's essential safeguards against improper prosecution.[8]

In these cases, the People concede that the creation of a certificate of translation is not burdensome.[9] In each of these three cases, they were actually prepared, in one form or another. As the People noted at argument, documenting the translation process has been routine practice for decades—it is a basic component of good police work. The contemporaneous filing of a certificate of translation, in which a translator attests to his or her fluency in the relevant languages and affirms the accuracy of the translation under penalty of perjury, would provide a degree of confidence in the translation that is akin to the in-court procedures mandated by the CPL (*see* CPL 190.25 [3] [d]).

---

[8] The majority correctly notes that defendants have raised no constitutional argument (and neither do I), but then inexplicably observes that the fact that most defendants plead guilty "does not add a constitutional dimension to a pleading requirement" (majority opinion at 16 n 4). One can certainly imagine a pleading requirement that would coerce guilty pleas and violate due process; the point of the majority's dicta is opaque.

[9] Laudably, the NYPD provides all officers with cellphones to connect to Language Line while in the field, trains officers on how to recognize when an interpreter is required, and certifies bilingual officers to "provide[] an objective barometer of individuals' fluency levels and help officers gauge when they need to seek assistance from a professional interpreter" (*NYPD and Legal Services NYC Announce New Language Access Policies*, NYPD [May 24, 2017], https://www1.nyc.gov/site/nypd/news/article.page?id=pr0524&permalinkName=nypd-legal-services-nyc-new-language-access-policies [last accessed May 3, 2021] (*see also* City of Buffalo, *Office of New Americans Initiatives*, https://www.buffalony.gov/423/Office-of-New-Americans-Initiatives [last accessed May 3, 2021] [noting that the Buffalo Police Department Language Access Plan includes Language Line telephone service, bilingual BPD members, civilian interpreters, and professional contract services, including in-person interpretation]). The resources to provide competent certificates of translation are already in place.

So we have a simple problem and a simple solution, about which the Court does simply nothing.  It is now simply up to the legislature.  The majority deprives defendants of the CPL's core procedural protections.  It eviscerates the efforts of our trial courts to require some minimal assurance that statements verified in a language unintelligible to the affiant are true, knowing that those statements will, in almost every case, never be tested for veracity.  And it does so based upon a skewed vision of victim's rights in which inadequate or unknown translation is preferred to the truth.  In the search for justice, an endless game of telephone is no mere child's play.

For the foregoing reasons and those set forth in Judge Rivera's dissent, I respectfully dissent.

For No. 27: Order affirmed. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Stein and Fahey concur. Judge Rivera dissents in an opinion, in which Judge Wilson concurs in a separate dissenting opinion.

For No. 28: Order reversed and case remitted to Criminal Court of the City of New York, Bronx County, for further proceedings in accordance with the opinion herein. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Stein and Fahey concur. Judge Rivera dissents in an opinion, in which Judge Wilson concurs in a separate dissenting opinion.

For No. 29: Order reversed and case remitted to District Court, Suffolk County, First District, for further proceedings in accordance with the opinion herein. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Stein and Fahey concur. Judge Rivera dissents in an opinion, in which Judge Wilson concurs in a separate dissenting opinion.

Decided May 6, 2021